## THOMSON-HOUSTON ELECTRIC CO. v. LORAIN STEEL CO.

(Circuit Court of Appeals, Second Circuit. February 27, 1901.)

### No. 99.

PATENTS—CONSTRUCTION AND VALIDITY—ELECTRIC MOTOR REGULATORS.

The Knight patent, No. 428,169, for an electro-motor regulator, which describes a device for use on that class of electric motors in which the reverser and the regulator are operated by separate levers, and consists of an interlocking mechanism connecting the two levers which prevents the movement of either except when the other is in a predetermined position, is not for a pioneer invention, but for an improvement only, in that class of motors, and must be limited in construction to substantially the device shown. The first four claims, which by their claims cover broadly any interlocking device for co-ordinating the two levers, are void in view of the prior art, which discloses such mechanism used for interlocking of the levers for operating railroad switches and signals, and the invention of the patentee is measured by the novelty of the particular device by which he applied the same principle to the levers of an electric motor.

Appeal from the Circuit Court of the United States for the Southern District of New York.

For opinion of trial court, see 103 Fed. 641.

Frank S. Busser, for appellant.

F. H. Betts, for appellee.

Before WALLACE and LACOMBE, Circuit Judges.

WALLACE, Circuit Judge. This is an appeal from a decree adjudging the validity, and infringement by the defendant, of claims 1, 2, 3, and 4 of letters patent No. 428,169, dated May 20, 1890, issued to Walter H. Knight, for an "electro-motor regulator."

The patent relates to the controller apparatus of motors used on electric railway cars and working on a circuit of constant potential, in which the regulator governing the speed and the reverser governing the direction of the car are operated by the manipulation of the motorman. In such apparatus the office of the regulator is to introduce resistance in the circuit for turning the current off and on and varying it from minimum to maximum strength, and the office of the reverser is to vary the direction of the current through one element of the motor. The invention which is the subject of the patent consists in improvements in the controller apparatus of that

class of these motors in which the reverser and the regulator are operated by separate levers.

As is pointed out by the patentee in the general statement of the nature and object of his invention, in motors working on a circuit of constant potential, such as are employed for electric railways—

"It is essential that a resistance or other device for opposing the electromotive force should be inserted in the circuit whenever the motor is at rest or its counter electro-motive force substantially diminished. Since a reversal of the motor of course reverses its counter electro-motive force, it is essential that it should only be reversed when the motor is at rest, and when there is substantially no current passing through it. A sudden reversal of the motor when in operation so affects the counter electro-motive force that, unless a resistance is inserted, the sudden flow of current which ensues is so great as to burn out the machine. Moreover, when the reversing device is a switch controlling the direction of the current in either the field magnet or armature, it is apt to be injured by operating it while the current is passing."

The object of the invention is to prevent reversal of the motor at an improper time, and also the operation of the regulator unless the reversing mechanism is set in one direction or the other. The gist of the invention is stated by the patentee in his specification as follows:

"My invention consists in providing a reversing mechanism for the motor with a stop or lock so that it can be operated only when there is a sufficient amount of resistance inserted to prevent injury, and it furthermore consists in providing a stop or lock for the resistance controller or regulator of the machine by which, when the reversing mechanism is at the neutral point, the resistance cannot be cut out. These devices absolutely prevent reversal of the motor at an improper time, and also the operation of the regulator unless the reversing mechanism is set in one direction or the other."

The specification describes the ordinary controller having a reverser and a regulator, each of which is actuated by its own lever or handle, the movement of the regulator handle varying the strength of the current, and the movement of the reverser handle varying the direction of the current. The two levers are joined by a connecting rod pivoted to a triangular shaped block having two projecting pins standing, when the reversing lever is at its central position, in a gap in a flange formed in a sector on the lower side of the regulating lever. Thus, when the reversing lever is in its central position, the motor having no tendency either forward or backward, it is impossible to move the regulator by reason of the flange striking the pins. When, however, the reversing lever is thrown to one side of the central position, the triangular block is turned, and assumes a position accordingly. But, whether the lever is moved to the left or to the right, one of the pins is turned to the inside of the flange and the other to the outside of the flange, so that the regulator can be turned, the flange passing between the two pins without interference. Conversely, when the regulating lever has been turned so as to interpose the flange between the two pins, the engagement of the flange with the pins will not allow the triangular block to be turned by a push or pull on the connecting rod, and consequently the reversing lever is locked. From this description it is obvious that the interlocking mechanism is so devised as to make it impossible to move the reversing lever except when the regulator lever is at its "off"

position, or to move the regulating lever unless the reversing lever is set for one definite movement of the car. Consequently, the motor-man, in order to reverse, is required not only to operate the revers-ing lever, but is compelled to bring the regulating lever back to its "off" position before the other can be moved; and conversely he can-not operate his regulating lever until his reversing lever has been moved from the intermediate position to the one side or the other. The claims of the patent are as follows:

"(1) The combination, with an electric motor, of a reversing device and regulator therefor, means for operating the same, and a stop for the re-versing device, controlled by the regulator, whereby the reversing device can be operated only when the regulator is in a predetermined position.

"(2) The combination, with an electric motor, of a reversing device there-for, a regulator, a stop for the reversing device, controlled by the regulator and locking the reversing device, so as to prevent its being operated except when the regulator is substantially at the point of maximum control.

"(3) The combination, with an electric motor, of a regulator therefor, a stop or lock for the regulator, and a reversing device for the motor connected to said stop, whereby the said stop is operated by the reversing device to lock the regulator against movement, except when the reversing device is in a predetermined position.

"(4) The combination, with an electric motor on a constant-potential cir-cuit, of a regulator and reversing device therefor, operated independently of one another, and an intermediate stop or lock connection, whereby the regu-lator and reversing device each controls the movement of the other.

"(5) The combination, with an electric motor on a constant-potential cir-cuit, of a reversing lever therefor, a regulating lever, a flanged segment on the regulator lever, a pivoted block having stops engaging with the flange of the segment, and a connection therefrom to the reversing lever, substantially as described."

The court below was of the opinion that as the patentee was the first to devise an electric motor having a reverser and regulator ma-nipulated by separate handles, in combination with a stop or lock so constructed and arranged as to leave both the reverser and the reg-ulator free to be operated independently of the other, but to compel the alternate manipulation of each, the claims were valid, and were entitled to a sufficiently broad construction to include every combi-nation or device effecting the same result by substantially the same means.

The patent undoubtedly describes new means for preventing the regulator and the reverser from simultaneous operation. The objec-tions sought to be obviated by the devices of the patent were well understood. The two types of motor in use supplied the means of obviating them in different ways, and placed them within the con-trol of the motorman. In one type the operation of both the regu-lator and reverser was controlled by a single handle or lever, movable each way from a central position, and at such central position auto-matically reversing the motor. The prior patents, to Weston of 1882, to Seamens of 1885, and to Weis, supply examples of this type. As shown in the Weis patent, the operations of the single lever were qualified by means of blocks and springs, so that, at the time of mak-ing the reversal, resistance was interposed in the circuit until the re-versal was completed, and then removed sufficiently to supply a suit-able current strength to the motor. The blocks and springs con-

trolled the contact of the resistance devices with the commutator, and were in a sense locking devices, being so arranged that, when the one set of brushes were brought into contact with the commutator, the other set were held in an off position. Thus, the reverser could not be operated until the regulator had shut off the current, and the regulator could not turn on the current until the reverser was in a receptive condition. In the other type of motors the regulator and reverser were operated by separate levers or handles, so that they could be manipulated only by a distinct operation. The prior patents, to Edison of 1883, to Sprague of 1885, and to Julien of 1888, supply examples of this type. In each of the two types it was, however, possible for the motorman to manipulate the apparatus improperly through carelessness,—in the first by performing the two operations of the single lever in too rapid sequence, and in the second by manipulating the handles of the separate levers at the same time. What the patentee did, consequently, was to introduce into motors of the second type a novel means of preventing the motorman from operating simultaneously, or substantially so, the separate regulator and reverser levers. He took the regulators and reversers as he found them in the prior art, and made no changes in their structural parts affecting their mode of operation in controlling the current, but superadded to them the devices for locking them into fixed relations with one another. What he did is described by the complainant's expert as follows:

"Knight does not pretend to have originated the idea of reversing the motor only at the time when the regulator is in its off position, or of regulating the motor only when the reverser is properly set; nor does he pretend to have originated the idea of locking the two devices together, so that a single handle can operate them only in a definite sequence. Those ideas were old, and Knight himself had used them both. What Knight did invent was the lock set and controlled by one device to lock the other."

The practical value of Knight's improvement may be conceded, but whether the two-handled controller with his interlocking devices is, on the whole, more efficient or less objectionable in practical operation on electric railways than the one-handled controller previously in use, is a question which is open to debate. Using the controller with the single lever, the motorman can reverse more quickly, and it would seem that, although in the two-handled controller the locking device prevents him from reversing too quickly, it likewise prevents him from reversing as quickly as is sometimes necessary. It appears that the specific locking device of the patent has never been employed, but that the two-handled controllers with devices embodying the interlocking principle have been and are extensively used.

It is insisted for the appellant that the improvements made by Knight did not involve patentable novelty; that the locking device shown in the patent is an inoperative one; and that the motors of the defendant are not an infringement of the claims of the patent. The question of infringement was regarded by the court below as the most serious one in the case.

The patent is in no sense a pioneer patent. The invention added a new feature to those pre-existing motors in which the regulator and

reverser were operated by different handles. The locking device was undoubtedly an improvement in that type of motors; but it was not an invention of such novelty and importance in motor apparatus as to make a distinct step in the progress of the art as distinguished from a mere improvement or perfection of what had gone before. It did not involve any problem peculiar to electrical mechanism. It involved merely the mechanical connection of two levers, each actuating the well-known current regulating devices taken from the prior art, without modifications, and which were to be fastened together so that neither would move except when the other was at a predetermined position. To co-ordinate the two levers in such a manner as thus to restrict the movement of either was old in lever mechanism, and it had been done by interlocking devices of various kinds. This is sufficiently shown by the evidence in the record of the prior art in the interlocking of levers for controlling railway switches and signals. The United States patent of 1875, granted to Smith, Toucey, and Buchanan, describes a combination of switch and signal levers, locking bars, and shafts carrying collars and stops, so constructed and arranged that the switch lever cannot be moved until the signal lever has first been moved, and the switch lever cannot be moved without locking the signal lever. The United States patent of 1876, granted to Finch and Moore, describes a combination of two levers with interlocking devices so arranged that one cannot be moved until the other is in the off position, and the movement of either serves to lock its companion, the interlocking devices consisting of slide bars, bolts, and slots. The United States patent granted to Cummings January 2, 1883, describes devices "whereby the switch lever and signal lever shall be interlocked, so that the switch lever cannot be operated to shift the switch until the signal has first been set to indicate danger, and, so long as either of the levers is unlocked and ready to be operated, the other lever is locked and secured in its position by the operation of the one which is unlocked or moving." The interlocking devices consist of a guide plate, and an oscillating, slotted, and recessed locking plate provided with slots through which the respective levers pass. In all these instances shown in the prior art, the levers, like those of the patent in suit, are two parallel shafts provided with handles and mounted side by side in a common frame, are manually operated, and are capable, except for the locking apparatus, of being simultaneously manipulated by the operator.

In view of the limitations imposed upon the claims by the prior state of the art, they ought not to receive a construction which will enable them to cover a combination in which the several devices are not substantially those described in the patent. It will not do to say that, because the patentee was the first to introduce locking devices into a motor in which the regulator and reverser were operated by different levers, he is entitled to a monopoly of all locking devices in such a motor that will co-ordinate the movements of the two levers so that neither will move except when the other is at a predetermined position. Precisely that function had been previously performed by the locking devices used to co-ordinate levers, and, if the patentee had done no more than to introduce them into the levers of

a motor, he would merely have made a change of location. He is entitled to the merit of being the first to conceive of the utility of interlocking the two levers of a motor controller of the type in which separate levers are employed, but his right to a patent must rest on the novelty of the means he has contrived to carry his idea into practical application. Aron v. Railroad Co., 132 U. S. 84, 10 Sup. Ct. 24, 33 L. Ed. 272. The patent cannot be broader than the real invention, and that is measured by the novelty of the particular contrivances which constitute the locking mechanism.

The first four claims of the patent are each framed to cover in the broadest terms the combination of any locking device with the other parts of a two-lever controlling apparatus which will effect the function or result recited in the particular claim. It is insisted for the complainant that they are infringed by any motor controller apparatus in which there is intervening mechanism between the reversing and the regulating levers which is operated by either lever to lock the other. The fifth claim is appropriately framed to secure to the patentee his real invention, and covers the locking devices described in the specification, including, of course, those which are substantially the same things.

We are of the opinion that the broad claims of the patent are not warranted by the scope of the real invention of Knight. As it is not asserted by the complainant that infringement of the fifth claim has been established, it is unnecessary to advert to the differences between the devices employed by the defendant and the patented devices. We conclude that the first four claims of the patent are invalid, and, in the absence of any proof of infringement by the defendant of the fifth claim, that the court below should have dismissed the complainant's bill, with costs.

The decree is accordingly reversed, with costs to the appellant, and with instructions to the court below to decree conformably with this opinion.