THOMSON–HOUSTON ELECTRIC CO. et al. v. NASSAU ELECTRIC R. CO. et al.

(Circuit Court, E. D. New York. March 18, 1901.)

PATENTS—VALIDITY—SWITCH FOR ELECTRIC MOTORS.

The Condict patent, No. 393,323, for a switch for electric railway motors, was anticipated, in so far as relates to the combined or mixed use of the rheostat and series-multiple systems of control therein claimed, by the Hunter patents, Nos. 431,720 and 385.180, both granted on applications filed before that of Condict, but is novel and valid as to the unity of switch control provided for in claims 27, 29, and 31, by which the operation of the rheostatic and series-multiple switches is effected by a single lever. Such claims also *held* infringed.

In Equity. Suit for infringement of patent. On final hearing.

Betts, Betts, Sheffield & Betts (Frederick H. Betts and Samuel R. Betts, of counsel), for complainants.

Harding & Harding (George J. Harding and Richard Eyre, of counsel), for defendants.

THOMAS, District Judge. The complainants own letters patent dated November 20, 1888, numbered 393,323, issued to one Condict upon an application filed April 26, 1888, and allege that the defendants use devices infringing certain claims thereof, to wit, 27, 28, 29, and 31 of one group, 20, 21, and 22 of another group, and also claims 2, 7, 19, 23, 24, and 30. The defense is anticipation, lack of patentability, and noninfringement. The alleged infringing apparatus is contained in controllers for electric railway motors used in the cars of the Nassau Electric Railroad Company, and manufactured by the Lorain Steel Company, and which are designated in the record as Nos. 1, 2, 3, and 4. The Condict invention involves, both for the purposes of diminishing or precluding injury to the motor and for regulating speed, the combined or mixed use of external resistances and series-multiple control. The specification distinctly describes these two purposes and advantages, giving, however, chief prominence to the preservation of the machinery by use of these two means of control in suitable adjustment and sequence. Although many claims are involved, for present purposes the main invention claimed is presented with sufficient fullness in claim 31, which is as follows:

"(31) The combination of two motors, a source of electric power, a motor-circuit, a switch for coupling the coils of the motors in series or multiple to vary their internal resistance, a resistance, a switch to insert the resistance when the motor-switch is being shifted, and a connection between said switches to operate both simultaneously."

The term "mixed control" has been employed to describe Condict's invention, and the definition of the term by Mr. Bentley, complainants' expert, may be useful:

"I understand that it relates to a principle of controlling or regulating railway motors, partly on the variation of the internal resistance of the motors by changing their circuits from series to multiple, and partly upon the variation of the circuit resistance external to the motors by a dead resistance."

The present inquiry is aided, and at the same time somewhat constrained, by the decision of Judge Townsend in Electric Car Co. of America v. Hartford & W. H. R. Co. (C. C.) 87 Fed. 733, where the Condict patent was sustained and infringement found; and by the order of Judge Lacombe, whereby a temporary injunction was granted in the present suit (Electric Car Co. v. Nassau Electric R. Co. [C. C.] 89 Fed. 204), which was affirmed on appeal, Judge Shipman writing the opinion (Electric Car Co. of America v. Nassau Electric R. Co., 33 C. C. A. 420, 91 Fed. 142). Inasmuch as Judge Townsend had decided upon final hearing, Judge Lacombe accepted his construction of the Condict claims, and held that the defendant's devices infringed them; and Judge Shipman considered the question on appeal, not only in the light of the Hartford decision, but also in view of any new evidence contained in the motion papers. The record in the Hartford Case was not before the circuit court of appeals, and the anticipatory patents presented to that court are alleged to be those of Buell, No. 255,249; Thomson & Houston, No. 220,948; Spang, No. 279,036; Edison, No. 273,490; Hunter, No. 385,055; and Paine, No. 321,749. Other evidences of prior use and knowledge

are presented in this record which were not before Judge Townsend or the circuit court of appeals, but they amplify the view of the prior art, and lead to a somewhat different conclusion respecting it. The principal contention herein relates to Nassau controller No. 4, and, if it shall be found to be an infringement of a valid patent, a like conclusion should be reached in regard to the other controllers. It is urged that the resistances used in No. 4 are rheostatic, pure and simple, and that they have no functions and give no advantages not present in rheostatic control. That is, they are used purely for the purpose of regulating speed, and not for the purposes of preventing the injury more specifically pointed out by Condict. It may be said at this time that the evidence does not seem to sustain this claim of the defendants, for it appears from the record, and seems to be conceded on the argument, that the preservative influence upon the motor is always present, although it is claimed that the advantage is incidental and very subsidiary. Indeed, it is difficult to understand how the two advantages may be separated, whatever principal purpose may have influenced the use of the two systems; for, as stated in the defendants' brief, "The same means which prevent too rapid acceleration are always available for regulating speed." No proper appreciation of the prior art may be obtained, save by a thorough understanding of the intimate knowledge that existed concerning both rheostatic and series-multiple control. It is quite safe to say that the use of external resistance was known for the last half of the nineteenth century, and that it was commonly employed to regulate electric motors. All the expert witnesses state that the rheostatic method was common before the Condict invention. Mr. Bentley, for the complainants, says that "prior to the Condict invention the most common method of regulation was to insert an artificial resistance between the motor and its source of current, which could be varied in amount, and check to any desired degree the flow of current to the motor," and that it was the "standard arrangement used by Mr. Van Depoele, the Thomson-Houston Electric Company, the Bentley-Knight Electric Railway Company, the Westinghouse Company, and others."

Dr. Kennelly, for the defendants, says:

"It was the common practice, therefore, in starting any but the smallest motors from rest, to inject a resistance or rheostat into their circuit for the purpose of checking the flow of current until such time as the armature of the motor had been brought to speed, and had been enabled to protect itself against unduly heavy currents by opposing the requisite and automatically adjusted counter electro-motive forces."

Mr. Wightman, for the defendants, states:

"The use of resistances to choke down the flow of current to prevent too sudden acceleration of the motor was as common and well-understood a device in the hands of the electrical engineer as the throttle valve to the steam engineer."

The use of resistance in accelerating a motor gradually from one speed to another was also common in the prior art. While the use of the rheostat was so familiarly known in the prior art as something that could be employed or laid aside at will, it was equally well understood that it was wasteful of energy, because it reduced

the effective voltage by consuming it, and thereby withholding it from use in propelling the motor. As Mr. Bentley stated:

"This resistance acted to absorb to a greater or less degree the impressed electro-motive force delivered from the line wire, and leave only a remainder to be applied to the motor. The amount absorbed represented a dead loss."

So in letters patent No. 271,042, issued to Curtis & Crocker, it is stated that the rheostatic method is objectionable "for the reason that, whenever any resistance external to the motor is introduced into the circuit, electrical energy is absorbed by it, and transformed into heat, without producing any useful electro-dynamic effect in the motor."

There was an effort to avoid this wastefulness which arose from a too prolonged use of the rheostat, and to this end, and to vary the power of the current applied to the motor, the series-parallel system was preferred. Hopkinson's English patent, No. 2,989, of 1881, describes the series parallel system:

"If desired, two or more dynamo-electric or magneto-electric machines may be employed in conjunction. When so used, they are rendered particularly adapted for the propulsion of tram engines, tram cars, and other vehicles, so as to obtain required variations in the speed by the employment of a switch so arranged as to throw the said machines into parallel circuit or into series, according as it is desired to drive the electro-locomotive or vehicle at full speed or at a less speed. In lieu of two or more complete machines, a single machine having two or more independent circuits may be used.   *   *   * In order to economically vary the speed of a tram car, tram engine, or other vehicle driven by electricity, two dynamo-electric machines may be used on the car, engine, or vehicle; and, when high speed is desired, these are arranged in parallel circuit; when a low speed and greater tractive force is required, they are arranged in series."

In 1884 Reckenzaun secured English patent No. 6,275, wherein he states the wastefulness of idle resistance, and, among other things, says:

"I so arrange the circuits that by means of a switch or commutator the motors may run in 'series,' in 'parallel,' or singly, or partly in 'series' and partly in 'parallel.' I may also arrange the field magnet circuits distinct from the armature circuits, and join their terminals in a variety of ways, known as in 'series' or in 'parallel,' and thereby vary the resistance of the circuit without inserting any 'idle' or artificial resistance."

This illustrates a knowledge of the use of rheostatic and series-multiple control, and a preference for the latter to the exclusion of the former. In the Telegraphic Journal and Electrical Review for July 6, 1888, July 13, 1888, and August 3, 1888, Reckenzaun describes the tests made in December, 1887, with his system in this country, whereby he shows the effective working of the system. Sprague used a similar system on his Richmond road in 1887, differing from Reckenzaun in that he provided three sets of field coils in place of two, and made changes by short-circuiting and then throwing in parallel one only of those coils at a time. The evidence tends to show that the system was reasonably successful, and that there was a considerable commercial demand for the controllers. The Julien patents, United States Nos. 384,580, 384,447, and British No. 2,470 of 1886, illustrate the series-parallel system of control. The Electrical World of November 20, 1886, described this system, and said:

"The car is started up by turning the lever, without the slightest shock. The movement is, in fact, remarkably smooth and pleasant, and the car can be stopped instantaneously. * * * It is noteworthy that M. Julien depends in no way upon artificial resistances. The rapidity of movement is controlled by the batteries, and full speed, half speed, and reverse motion are all obtained by the merest turn of the lever. To the regulator are brought the connections of all sections of the battery, working alternatively in series and in parallel."

The Julien system employs batteries as a source of supply, and is lacking in economy. The fact that the use of external and internal resistances was well known, and that the series-multiple was preferred, does not show that it was not understood that the two could be used in conjunction. It must have been a matter of familiar knowledge that there could be a combined use, but it is undoubted that the thorough appreciation of the wastefulness of the rheostatic method diverted the mind to the system that would exclude or minimize such use. Reckenzaun stated in 1884, in English patent No. 6,275, where he showed motors in parallel and in series:

"Hitherto engineers have resorted to artificial resistances inserted between the motor and the 'leads' supplying the current; but, though by recourse to such means the amount of current flowing could be regulated, still such artificial or 'idle' resistances are exceedingly wasteful."

He stated that he used the series-parallel system, and thereby varied "the resistance of the circuit without inserting any 'idle' or artificial resistance." Obviously, Reckenzaun knew that the rheostat could be used, but judged it better and more economical not to use it. Condict knew it could be used, and judged that it was better to use it.

But the prior art shows not only full knowledge of the two systems, and of ability to use them in conjunction, but their actual use and adaptation are shown in letters patent No. 431,720, issued to Rudolph M. Hunter July 8, 1890, upon an application filed January 26, 1887,—more than a year before Condict's application. The specification states:

"The motors are connected together by a circuit, and may be coupled in multiple or series connection, and provision is made for varying the resistance of the motor-circuit. * * * R is the motor-circuit, and connects both motors in circuit with the contact-shoes, i, i. The current may be regulated by the resistance-changer, r, which may be operated by a lever or handle, s, on the front of the car-body, as in the case of the brush-shifting devices. As shown in Fig. 2, the motors are in parallel or multiple circuit, but may be put in series connection by switches, T, T, when necessary,—as, for instance, in starting, or when the potential of the current has greatly increased and volume of current decreased from any cause."

The diagram embodies this description, and together with the specification shows a union of the two methods operated by separate switches. Mr. Bentley, complainants' expert, states that Hunter was Condict's attorney in the matter of Condict's patent, but Hunter's description above antedates that relation. The same witness states that, "so far as any regulator is shown, it is a rheostat, and this is only indicated diagrammatically." This second statement seems erroneous, but it is quite necessary that the witness' evidence concerning this patent of Hunter be set out more fully. He says:

"The patent is directed towards an electric truck, and the claims pertain to the arrangement of the motor upon the vehicle. So far as any regulator is shown, it is a rheostat, and this is only indicated diagrammatically. As a distinct matter from the rheostat, two separated and disconnected switches are shown, by which it is said that, while the motors are in parallel or multiple circuit, yet they may be put in series connection when necessary, as at starting, or when the potential of current is greatly increased, and the volume of current decreased, from any cause. This showing is a mere incident. No claim is made to it in the patent, and no organized controller on the mixed principle of Condict shown or suggested. The series-multiple switches are not connected together so as to be operated simultaneously or in any prescribed sequence, nor are the two switches for changing the circuit connected together themselves. Thus, they would have to be operated apart from, and by separate movements from, the rheostat, and each would itself require a movement distinct from the other. Thus, taking the suggestion of Hunter, it amounts simply to the use of the rheostat as the ordinary and fundamental controller, with an occasional operation of the series-multiple switch in an emergency to put the motors in series before operating the usual controller. There is no construction teaching the art to give up the rheostatic method of control, and go to the mixed system of Condict. Much less does it contain an organized structure explaining and illustrating the practical way of building an apparatus on this principle."

Beyond this statement that there is no unity of switch control, the attempted avoidance of the Hunter patent by Mr. Bentley seems to result in the concession that what Hunter says and shows "amounts simply to the use of the rheostat as the ordinary and fundamental controller, with an occasional operation of the series-multiple switch in an emergency to put the motors in series before operating the usual controller." But the statement of Hunter is plain. He directs the use of "the resistance-changer, r," to regulate the current. He states that the motors are shown in parallel, but that they "may be put in series connection by switches, T, T, when necessary,"—as, for instance, in starting, or when the potential of the current has greatly increased, and volume of current decreased, from any cause. This is a description of the conjunction of the two systems, in few but precise words, and to the lay mind the language is fully expressive of the idea of mixed control. Mr. Bentley's sentence, "There is no construction teaching the art to give up the rheostatic method of control, and go to the mixed system of Condict," is not understood. He has just stated that the rheostat is the "fundamental controller," and that there is an "occasional operation of the series-multiple switch in an emergency." Hunter has not limited his use of the series-multiple to an emergency, but has palpably extended it to common operation. Hunter did not claim that it was invention,—indubitably, because he was speaking of devices that were of common knowledge and usual adaptation. The construction of Hunter's device by Mr. Jenks, one of the complainants' experts, is not more fortunate for the complainants. He says:

"From these statements, which, I think, comprise all in the specification which throw any light upon the method of control of the propelling motors, it appears that three plans of regulation were aggregated on one car, and that it was left to the judgment of the motorman which of these three should be used under any given circumstances. A considerable amount of attention is paid to the method by which the brushes are shifted as to their bearing points on the commutators of the motors, and it may properly be inferred that

this method was to be frequently utilized by the motorman, because the apparatus for this shifting was placed directly within his easy reach."

Dr. Kennelly states:

"In a patent to the same grantee, No. 431,720, which was issued in 1890, but which was applied for in January, 1887, series-parallel of two motors is shown and described, in conjunction with rheostatic control. In other words, there is a system of switches both for changing the motors from series to parallel or vice versa, and also for inserting and retaining a variable amount of resistance in the circuit of both. These switches are diagrammatically represented, and are not shown as collocated into a single structure or co-ordinated in their functions. * * * If you mean what references show series-parallel control with the addition of an auxiliary rheostat or rheostatic control, my answer is, * * * U. S. patent No. 431,720, to Hunter."

At a later time, March 15, 1888, and still before Condict's application, Hunter, in letters No. 385,180, states:

"I may vary the resistance exterior to the source of power in many ways, some of which may be enumerated as varying the internal resistance of the motor either by cutting in or out its coils, or by coupling up said coils in various ways, or by varying a resistance in the motor-circuit and exterior of the motor, or both combined."

From the foregoing it appears that the use of the rheostat and series-multiple systems of control, separately or in conjunction, had been understood and described before Condict's invention. The serious inquiry follows whether there was any prior knowledge or use of the unity of switch control shown in Condict's invention. Each of claims 27, 29, and 31 clearly comprises as one of its combined elements a provision for collocating the switches into a single structure and co-ordinating their functions. Judge Shipman says of Condict's invention:

"His controller therefore utilizes each system by the movement of one handle, so that the shock which would be caused by a sudden change of motor connections is prevented by the introduction of dead resistance before or at the time of such change. The switch can also be used for slight changes in the resistances, 'when slight variation in the speed or power of the motors is required.'"

The value of this element of a single switch controller is undoubted, but was Condict privileged to appropriate a combination whereby the several switches in a controller should be operated in co-ordination by the movement of one lever? This question calls for an examination of the state of the art anterior to Condict. Mr. Bentley says:

"The Condict controller has a definite operative connection between the several switches, so that the operation of one involves a subsequent operation of the other, and each complete operation of the controller as a whole involves the operation of both the motor-circuit switch and the resistance switch."

There are several principal movements actuated by the controller: (1) Variations in resistance of the circuit; (2) grouping the motors or field coils, or both; (3) reversal of direction. With one switch Sprague, before Condict's time, controlled variations of resistance and reversal of direction. With the other he effected the grouping of the motors. Condict controls the motors and resistances with one switch, and the reversal of direction with the other. The Paine

patent, No. 321,748, of 1885, relates to an improvement in regulators for electric lights.  The specification states:

"The object we have in view is to increase the efficiency of the apparatus so that the variations in the light will be more gradual.  This we do by combining in a single progressively-acting switch the principle of throwing the lamps into and out of circuit in groups, with that of varying the candle-power of the lamps of each group, both by throwing the groups into and out of arrangements in series and by the use of external resistances.  *  *  * Our object, further, is to provide means for operating two or more of the switches together or separately, as desired."

Mr. Bentley thinks that he is justified by Judge Shipman's opinion in distinguishing between the control of lamps and the regulation of motors.  But Judge Shipman, in distinguishing the Paine patent, was attentive to the main question of the mixed system of control, and not to the mere mechanical devices for effecting their co-action by the use of the single lever.  It will be observed that the Weston patent, No. 264,982, of 1882, provides for the use of one lever to control circuit changes and insert resistances.  It is true that the circuit changes that Weston desired to make were not the same changes involved in the Condict letters.  After a more extended description, which is worthy of consideration, Weston states—

"That the combination of devices just described serves not only as a shifting device, but as a convenient means of effecting the regulation of the speed of the motor by shifting the position of the brushes, and at the same time interposing resistance as the counter electro-motive force is reduced."

So, in letters patent No. 320,630, issued to Daft in 1885, which relate to an improvement in switches, designed to cause motors to operate in either direction, and to regulate their speed, there are evidences of similar knowledge.  Concerning this matter, Mr. Bentley states:

"It had long been well known in ordinary rheostatic control that the rheostat could be operated by means of the same handle which worked the reverse-switch; a duplicate set of rheostat contacts being provided, or a similar expedient adopted by which either movement of the reversing-handle could operate the controlling rheostat.  It is not obvious what bearing this has upon the Condict invention, since it involves no series-parallel control at all, and is not related in the remotest degree to the problem before Condict, and the structure be devised therefor.  It is sufficient to dispose of this patent to point out that it has no series-parallel regulation of the motor, and that Dr. Kennelly himself omits it from the list given in answer to the question propounded to him."

In letters patent No. 279,036, issued to Spang in 1883, the second claim is as follows:

"The combination, with an electro-motor, of a switch or shunting device having a movable lever and contact-pieces with which the terminals of the coils of the field-magnet and resistances, respectively, connect, whereby a movement of said switch will cut out or shunt a portion of the coils of said magnet, and simultaneously introduce into the circuit resistances equivalent to that of the portion of the magnet cut out or shunted."

This inventor with one switch control cuts out or shunts a portion of the coils of the field-magnet, and at the same time he cuts in equivalent resistance.  Condict couples the coils of the motor in series or in multiple, by short-circuiting or shunting, cutting in

and out resistances to effect the result. In letters patent No. 346,527, issued to Beattie in 1886, it is said:

"The system including my invention consists of an armature provided with two sets of grooves—the one longitudinal, and the other circular—around the axis of the armature, and with a groove running across each end of the armature; of field-magnets provided with several independent coils upon each leg or arm of the magnets; of a governor geared to the armature-shaft and to a lever which is adapted by its movements to cut out one or more of the field-magnet coils, and to substitute therefor one or more equivalent coils which are not a part of the field-magnets."

This is understood to show a unitary control of the circuit and rheostats. The fact seems to be that before Condict there was no description of a mechanism effecting, by a single lever, an operation of rheostatic and series-multiple switches. Coils had been coupled in series or multiple, and resistances used in conjunction, but each switch had been moved by a separate lever. Although a survey of the prior art lends much support to the claim that Condict simply used a single switch to produce circuit changes in the appropriate introduction and removal of resistances, as had been done before, yet Condict's changes were essentially different. Condict's system of bringing the resistances and motors under the control of a single lever, and separating the reversing switch, is the present adopted method. Why did not Hunter employ this system? It could not have been advantageous for him to use two switches. Modern experiences derived from the extended use of motors for the movement of cars prove this. Hunter was a solicitor of patents. He was himself skilled in the subject-matter here involved. He united external resistances and series-multiple control. He invented but a year before Condict. He knew, presumptively, all that existed. He knew that one switch had been used for the rheostat and reverse switch. That was well known. He must have known that one switch was common for circuit changes and rheostatic resistances. Yet, with all his knowledge as an attorney making a specialty of patents, and an inventor, he did not see that the successful operation of his device required that one hand should control by one lever the external resistances and internal changes. Sprague states that he was called upon to make a choice either of grouping resistances and motor changes, or of grouping one of them with the reversal of direction. He put variation of resistance and reversal together. Events have condemned his selection, and prove his choice so unwise as to indicate lack of conception of the Condict method. Any plan that requires the conjunctive use of mechanism for rheostatic and series-multiple control demands that there should be one lever, whereby the mechanism may be controlled with unity of thought and action. It may be that a skilled mind could use two hands and two levers, making a nice adjustment of these two systems. But the hands that hold the levers on tens of thousands of cars operating under constantly varying conditions and emergencies are not those of electrical engineers. Practice and discipline may aid, but there must be such unitary and automatic action of the machinery that the mind may instinctively direct the hand of the operator to the proper use of the controlling appliance.

It is difficult to understand why Hunter did not grasp this necessity and advantage, but he did not, and Condict did; and the value of it is so great that it is not logical to assert that these known unitary controls of circuit changes and resistances made Condict's device no new thing in mode of operation. This conclusion has not been reached without considerable doubt, but the considerations that support it preponderate.

The final inquiry is, does the defendants' device infringe any of Condict's claims herein held to be valid? The defendants' painstaking and instructive brief is clear, and has been read with great care upon this subject, but in the end the impression obtained upon the argument has grown to suitable conviction that there is infringement. Notwithstanding the long time ocupied in the hearing and consideration of this case, the court would pursue the defendants' argument step by step, and point out the process by which its conclusion has been reached, were it not that the case, in the matter of infringement, shows no new fact not before the circuit court of appeals that would justify a departure from its holding respecting infringement. But the nature of the Condict invention is, under the facts in this record, not that stated by Judge Townsend and by the circuit court of appeals. The invention, as regards mixed control, seemed then to be unanticipated and broad. It is now narrowed by the fact that the invention derives its chief novelty from the unitary control. But that control is provided for, apparently, in only claims 27, 29, and 31 of the principal group. If there should be doubt about the precise claims that cover the invention as above construed, counsel will be heard in that regard. The court also desires to hear counsel respecting the group of claims 20, 21, and 22, and also claims 2, 7, 10, 23, 24, and 30, to which slight attention was given on the argument, and concerning some of which the recent decision of the circuit court of appeals in Thomson-Houston Electric Co. v. Lorain Steel Co., 107 Fed. 711, has a bearing. Counsel can be heard on motion day.